## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ADAM MOOMAW, REGAN MOOMAW, and SARAH GUSTAFSON Individually and on behalf of all others similarly situated** )<br>)<br>)<br>)<br>) | |
| )<br>**Plaintiffs,** ) | **Case No. 3:23-cv-1321-DWD** |
| )<br>**vs.** )<br>) | |
| **GEOSNAPSHOT PTY LTD, an Australian proprietary limited company** | |
| **Defendants.** | |

## <u>MEMORANDUM & ORDER</u>

**DUGAN, District Judge:**

Plaintiffs Adam Moomaw, Regan Moomaw, and Sarah Gustafson, bring this putative class action, individually and on behalf of all other similarly situated persons, against Defendant GeoSnapShot PTY LTD ("GeoSnap" or "GeoSnapShot"), asserting claims under the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA").[1] Presently before the Court is GeoSnap's Motion to Compel Arbitration or, Alternatively Under FRCP 12(b)(6) to Dismiss Plaintiffs' Amended Complaint.

### I.    OVERVIEW

GeoSnap is an online platform ("Website") that allows registered photographers ("Photographers") to attend events, upload their photos to the Website, and receive a

---

[1] Defendants removed this action from the Circuit Court of St. Clair County, Illinois pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453.

commission (shared with GeoSnap) on the photos that are sold through the website. (Doc. 58, ¶ 4).

GeoSnap's business model is dependent on its collection and use of the biometrics of the people depicted in its online photo platform. (Doc. 58 ¶ 5). GeoSnap encourages event participants to find photos of themselves by uploading a "selfie" and allowing its artificial intelligence to compare that photo with the others in its database. (Doc. 58 ¶ 5). This can only be done by extracting from each photo data representing the unique geometry of each facial image so that comparisons can be made. (Doc. 58 ¶ 5).

In April 2019, GeoSnap contracted with Tough Mudder, an endurance event company, to allow Photographers to attend and take photographs of participants in Tough Mudder events. (Doc. 58 ¶ 34). Tough Mudder promotes endurance events in which participants attempt 10 to 12 mile-long obstacle courses that feature hazards such as fields of mud and tanks of cold water. (Doc. 58 ¶ 35). In an article promoting the partnership, GeoSnap founder and chief executive Andy Edwards emphasized that GeoSnap's biometric-based Selfie Search feature was central to the agreement. Because Tough Mudder participants "come out from the muddy depths," the article quoted Edwards as saying, "face recognition is the only thing that will find photos of them." (Doc. 58 ¶ 37). In the same article, Edwards touted the Tougher Mudder partnership as one that would help GeoSnapShot realize "500% growth" in 2019. (Doc. 58 ¶ 38).

On August 24, 2019, Plaintiffs Adam and Regan Moomaw attended the "Tough Mudder Chicago Saturday" event held in Rockford, Illinois. (Doc. 58 ¶ 40). Plaintiff Sarah Gustafson attended Tough Mudder events held in Rockford Illinois, in 2019, 2021, and

2022. (Doc. 58 ¶ 46). As is relevant to GeoSnap's arbitration argument, GeoSnap contends Plaintiffs executed waiver agreements when they signed up to compete in the Tough Mudder competitions. (Doc. 62, 62-1).

GeoSnap has provided the Court with copies of five waiver agreements purportedly executed by Plaintiffs. Three of the agreements were executed prior to 2021 (one each for Adam Moomaw, Regan Moomaw, and Sarah Gustafson relating to the 2019 Tough Mudder event in Rockford, Illinois) ("Pre-2021 Agreements). (Doc. 62-1). The remaining two waiver agreements were executed by Sarah Gustafson in 2021 and 2022 (relating to Gustafson's participation in the 2021 and 2022 Tough Mudder events in Rockford, Illinois) ("Gustafson 2021/2022 Agreements"). (Doc. 62-1). The Pre-2021 Agreements include a choice of law provision designating the law "in the State in which the TM Event is held" as controlling, while the Gustafson 2021/2022 Agreements designate Delaware law as controlling. (Doc. 62-1).

During the events, one or more photographs containing Plaintiffs' facial images were taken and subsequently uploaded to the Website. (Doc. 58 ¶¶ 41, 47). After the photographs containing Plaintiffs' facial images were uploaded to the Website, GeoSnap scanned them and extracted data representing the unique geometry of Plaintiffs' facial images. (Doc. 58 ¶¶ 42, 48). GeoSnap profited from the use of Plaintiffs' biometrics by using them to enable the Selfie Search feature that facilitates the sale of photographs through the Website, and in turn generates GeoSnap's primary source of revenue. (Doc. 58 ¶¶ 44, 50).

Under BIPA, "scan[s] of . . . face geometry" are biometrics, 740 ILCS 14/10. Plaintiffs argue GeoSnap cannot collect or use such scans unless it complies with BIPA. Plaintiffs seek statutory liquidated damages for each of several alleged technical violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/5 et seq.

GeoSnap contends that, pursuant to the waiver agreements Plaintiffs purportedly executed with Tough Mudder, Plaintiffs agreed to "(1) mediation or arbitration for 'all disputes, controversies or claims arising out of [Plaintiffs'] participation of the [Tough Mudder event…'; and (2) waive the right to proceed as a class action." (Doc. 62). Although GeoSnap is a non-signatory to the waiver agreements, it seeks to compel arbitration based on its alleged third-party beneficiary status. Alternatively, to the extent Plaintiffs do not have to arbitrate their claims, GeoSnap seeks to dismiss all or part of their First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 62).

## II.    DISCUSSION – MOTION TO COMPEL ARBITRATION

### A. Legal Standard

The Federal Arbitration Act ("FAA") mandates that courts enforce valid, written arbitration agreements. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002) (citing 9 U.S.C. § 2). This mandate reflects a federal policy that favors arbitration and "places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)  Arbitration should be compelled under the FAA when "three elements are present: (1) an enforceable written agreement to arbitrate, (2) a

dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018) (citing 9 U.S.C. §§ 3–4).

Courts deciding motions to compel arbitration apply a summary judgment standard under Federal Rule of Civil Procedure 56. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). "A district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if no genuine dispute of material fact exists as to the formation of the agreement." *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 618 (7th Cir. 2024). The party seeking to compel arbitration "bears the initial burden to show that an arbitration agreement exists." *Id.*

### B.  Background

Prior to competing in the Tough Mudder events alleged in the Amended Complaint (Doc. 58), Plaintiffs were required to execute a liability agreement. As previously noted, Adam Moomaw, Regan Moomaw, and Sarah Gustafson purportedly executed liability agreements prior to attending the 2019 Tough Mudder event in Rockford, Illinois (Pre-2021 Agreements"). (Doc. 62-1, pgs. 8-31). In addition, Sarah Gustafson purportedly executed two liability agreements prior to attending the 2021 and 2022 Tough Mudder events in Rockford, Illinois ("Gustafson 2021/2022 Agreements"). (Doc. 62-1, pgs. 32-43).

All five liability agreements include an arbitration provision wherein Plaintiffs agreed to (1) mediation or arbitration for, "all disputes, controversies or claims arising out of [Plaintiffs'] participation of the [Tough Mudder] event…"; and (2) waive the right to proceed as a class action. (Doc. 62-1, pgs. 10, 18, 25, 34, 40). The Pre-2021 Agreements

include a choice of law provision providing for application of the law "in the State in which the TM Event is held." (Doc. 62-1, pgs. 10, 18, 26). The Gustafson 2021/2022 Agreements include a choice of law provision providing for the application of Delaware law. (Doc. 62-1, pgs. 34, 40). GeoSnap admits that it is a non-signatory to the liability agreements but claims that, as a third-party beneficiary, it may enforce the arbitration provisions contained therein.

### C. Analysis

Plaintiffs dispute that they contracted to arbitrate claims with GeoSnap. Thus, before determining whether the arbitration provisions apply to Plaintiffs' claims or whether that very question itself is delegated to the arbitrator, the Court must first determine whether a valid contract exists. GeoSnap contends that an arbitrator, not the Court, must decide whether such an agreement exists. GeoSnap's view is mistaken; it conflates the question of contract formation with the question of contract enforceability.

As the Seventh Circuit explained recently in *K.F.C. v. Snap, Inc.*, "judges must decide that a contract has been formed before they may order arbitration." *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022); *accord Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) ("The court must decide whether a contract exists before it decides whether to stay an action and order arbitration."). This is because, "[e]ven the most sweeping delegation cannot send the contract-*formation* issue to the arbitrator, because, until the court rules that a contract exists, there is simply no agreement to arbitrate." *K.F.C.*, 29 F.4th at 837 (emphasis added).

The Court further finds that, whether GeoSnap, a non-signatory to the liability agreements, can compel arbitration is a question of contract formation, which must be decided by the Court. See, e.g., *CCC Info. Servs. Inc. v. Tractable Inc.*, 2019 WL 2011092 at *2 (N.D. Ill. May 7, 2019) (whether a non-signatory defendant could enforce an arbitration agreement was a question of contract formation that must be decided by the Court because it pertained to whether an agreement "exist[ed] at all"), aff'd, 36 F.4th 721 (7th Cir. 2022). Cf. *K.F.C.* 29 F.4th at 838 (because Illinois law treats contracts entered into by children as voidable rather than void, argument that it would be against public policy to enforce arbitration agreement against non-signatory minor concerned the agreement's "validity, not its existence," and was therefore a question for the arbitrator). Thus, in the instant case, the Court finds that whether GeoSnap, as a non-signatory, can enforce the subject arbitration agreements is a question of contract formation that must be decided by the Court.

Next, the Court must determine what body of law governs whether a contract exists. To the extent GeoSnap contends the FAA controls, GeoSnap is mistaken; state law governs the issue of contract formation. See *Arthur Andersen v. Carlisle*, 556 U.S. 624, 630 (2009) (The FAA does "not alter background principles of state contract law regarding the scope of agreements"—"including the question of who is bound by them."). See also *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (A "nonparty's right to enforce an arbitration agreement is governed by state law."); *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) ("[C]ontract formation is governed by state law."). As to which State's substantive law controls, a federal court sitting in diversity applies the choice-of-

law rules of the forum state *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743 (7th Cir. 2012) (internal citations omitted). So, Illinois choice-of-law rules determine what law governs the contract formation issue.

But, as is explained more fully below, the Court need not engage in a lengthy choice-of-law analysis. As previously noted, the Pre-2021 Agreements provide for the application of the law in the State where the Tough Mudder event was held (in this case, Illinois), and the Gustafson 2021/2022 Agreements provide for the application of Delaware law. In a footnote, GeoSnap notes that the Gustafson 2021/2022 Agreements provide for application of Delaware law. GeoSnap, however, does not discuss the Pre-2021 Agreements, including whether Pre-2021 Agreements contain a choice-of-law provision.[2]

At first glance, the substantive law of both Delaware and Illinois appear to be in play. Plaintiff advocates for application of Illinois law and GeoSnap, albeit briefly, references a Delaware choice-of-law clause in the Gustafson 2021/2022 Agreements. But

---

[2] This is GeoSnap's second motion to compel arbitration. In its first motion to compel arbitration (Doc. 45), which was mooted by the filing of Plaintiff's First Amended Complaint (Doc. 58), GeoSnap argued for the application of Delaware law. At the time, Adam Moomaw and Regan Moomaw were the only plaintiffs. GeoSnap argued that the Moomaw's Pre-2021 Agreements included a choice of law provision requiring the application of Delaware law. GeoSnap argued that, under Illinois law, as a non-signatory it could *not* enforce the arbitration provision in the Moomaw's Pre-2021 Agreements, but under Delaware law GeoSnap, as a non-signatory, could enforce the arbitration provision. GeoSnap further argued that, given the choice of law provision in the Pre-2021 Agreements, the Court was required to apply the law of Delaware. Plaintiffs responded, noting that the Moomaw's Pre-2021 Agreements did *not* contain a choice-of-law clause providing for the application of Delaware law. (Doc. 50). In fact, the Moomaw's Pre-2021 Agreements included a provision providing for the application of the law "in the State in which the TM Event is held." (Doc. 50, pgs. 8-9). In other words, Illinois law. Thereafter, GeoSnap filed a reply admitting that Plaintiffs were correct and alleging that the mistake was due to counsel inadvertently reviewing a different version of Tough Mudder's liability agreement. (Doc. 51).

GeoSnap's briefing does not present *any* argument addressing the choice of law issue.[3] Further, both GeoSnap and Plaintiffs rely on Illinois law in their briefing. Therefore, to resolve the contract formation issue, the Court applies Illinois law. *See Brunswick Leasing Corp. v. Wisconsin Cent.*, Ltd., 136 F.3d 521, 525-26 (7th Cir. 1998) (if neither party argues that the forum state's choice of law rules require the application of another state's substantive law, then the substantive law of the forum state governs).

That being said, even if the Court were to conduct a choice-of-law analysis, the choice-of-law provisions in the liability agreements would not control. Under Illinois choice-of-law rules, which follow the Restatement (Second) of Conflicts (1977), courts will enforce a choice-of-law clause contained in the contract – when a valid contract has been formed. See *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996) ("In disputes such as this one that arise from a contract, Illinois law respects the contract's choice-of-law clause *as long as the contract is valid.*") (emphasis added).

In the instant case, Plaintiffs contend they did not enter into a contract with GeoSnap. When contract formation is in issue, applying the choice-of-law clause contained in the disputed contract would assume the answer to the antecedent question of whether a contract was formed is yes. See e.g., *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, No. 07 C 1707, 2008 WL 687224, at *3 (N.D. Ill. Mar. 7, 2008) ("as an

---

[3] As noted above, in its initial motion to compel, GeoSnap argued for the application of Delaware law, which according to GeoSnap, allows non-signatories to a contract to compel arbitration under the contract. In the instant motion, although GeoSnap claims the Gustafson 2021/2022 Agreements include a Delaware choice of law provision, GeoSnap does not advocate for the application of Delaware law. The Court therefore concludes that GeoSnap has abandoned this argument, and to the extent that it has not, the argument is waived. *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.").

antecedent matter, the court must determine whether the parties have a valid contract, and, before it can do that, it must decide which state's law applies to the issue of contract formation. Only if the court finds a valid contract may it turn to the choice of law provision in the Agreement....”). See also e.g., *Sosa v. Onfido, Inc., No. 1:20 CV 04247, 2021 WL 38141, at \*2 (N.D. Ill. Jan. 5, 2021),* aff'd, 8 F.4th 631 (7th Cir. 2021) (when contract formation is in issue, it would be inappropriate to apply a choice-of-law provision because “the antecedent question of whether that document applies to the parties [has not been resolved]”). Thus, if the Court were to conduct a choice-of-law analysis, any choice-of-law provision would yield to the law of Illinois, which has adopted the “most significant relationship test” for deciding among conflicting laws. *See Purcell & Wardrope Chartered v. Hertz Corp., 175 Ill.App.3d 1069, 125 Ill.Dec. 585, 530 N.E.2d 994, 1001 (Ill. App. 1988).*

Having resolved the threshold choice-of-law questions, the Court turns to whether GeoSnap, as a non-signatory to the liability agreements, has standing to require Plaintiffs to arbitrate. GeoSnap asserts that it has a right to enforce the arbitration provisions because it is a third-party beneficiary to the Agreements. GeoSnap claims the Agreements apply broadly to “Released Parties.” The Pre-2021 Agreements (relating to Adam Moomaw, Regan Moomaw, and Gustafson’s attendance at the 2019 event in Rockford, Illinois) define “Released Parties” as “Tough-Mudder Incorporated and its directors, officers, employees, agents, contractors, insurers, spectators, co-participants, equipment suppliers, and volunteers.” (Doc. 62-1, pgs. 8, 16, 24). The Gustafson 2021/2022 Agreements (relating to Gustafson’s participation in Tough Mudder events in 2021 and

2022 in Rockford, Illinois) define "Released Parties" as "OCR US Holdings, LLC d/b/a Tough Mudder ("TM") and its parent Spartan Race, Inc. ("Spartan") and their respective affiliates, directors, officers, employees, agents, contractors, insurers, spectators, co-participants, equipment suppliers, and volunteers."(Doc. 62-1, pgs. 24, 32). The Pre-2021 Agreements incorporate Released Parties into the term "Tough Mudder," but the 2021/2022 Gustafson Agreements do not incorporate Released Parties into the term "Tough Mudder." Instead, the terms of the Gustafson 2021/2022 Agreements sometimes include "other Released Parties" and sometimes do not. (Doc. 62-1, pgs. 32-43).

GeoSnap contends that it is a Released Party because "[e]ssentially, Released Parties would apply to anyone or any company that had anything to do with the Tough Mudder event." (Doc. 62, pg. 10). Additionally, GeoSnap contends the Affiliate Partnership Agreement it entered with Tough Mudder Incorporated demonstrates that the companies have a direct affiliate relationship. (Doc. 62-2).

Plaintiffs contend GeoSnap cannot be a third-party beneficiary because the arbitration clauses contained in the Pre-2021 and Gustafson 2021/2022 Agreements do not refer to Released Parties or otherwise suggest that it applies to or benefits Released Parties.[4]    Additionally, Plaintiffs contend that GeoSnap's third-party beneficiary

---

[4] Plaintiffs also contend that the terms of the Pre-2021 Agreements indicate that all Released Parties have substantial control over how Tough Mudder events are operated. Plaintiffs contend this conflicts with GeoSnap's prior declaration under penalty of perjury declaring that "GeoSnap [does not] ha[ve] any role in…the promotion of [Tough Mudder] events, the enrollment of participants in those events, or the operation of the events." (Doc. 26-1, ¶ 10). Accordingly, Plaintiffs argue, GeoSnap is judicially estopped from claiming it is a released Party. Because the Court finds that GeoSnap is not entitled to enforce the arbitration provisions in the Agreements, the Court need not address this argument. However, the Court notes that Released Parties includes groups that clearly do not exercise substantial control over Tough Mudder or its events, including spectators, co-participants, and volunteers. Thus, the Court questions the validity of this argument.

argument fails as to Gustafson because her agreements were executed on October 11, 2018, August 5, 2021, and August 17, 2022, and the Affiliate Partnership Agreement was not in effect when Gustafson executed her agreements. Further, Plaintiff notes that the latter two agreements do not mention the entity that GeoSnap contracted with (Tough Mudder Incorporated); they refer instead to "OCR US HOLDINGS, LLC d/b/a Tough Mudder…and its parent SPARTAN RACE, INC."

"A nonsignatory to a contract typically has no right to invoke an arbitration provision contained in that contract." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 639 (7th Cir. 2021) (applying Illinois law). Generally, under Illinois law, only signatories to an arbitration agreement can move to compel arbitration. See *Bishop v. We Care Hair Dev. Corp.*, 738 N.E.2d 610, 619 (Ill. App. Ct. 2000). But Illinois law recognizes exceptions to that general rule, under theories involving third-party beneficiaries, agency, and equitable estoppel. *Id.* (citing *Ervin v. Nokia, Inc.*, 714, 812 N.E.2d 534, 539–41 (Ill. App. Ct. 2004)). Illinois law distinguishes between intended and incidental beneficiaries. *Hacker v. Shelter Insurance Co.*, 902 N.E.2d 188 (Ill. App. Ct. 2009). An intended beneficiary is intended by the parties to the contract to directly benefit for the performance of the agreement; under the contract an intended beneficiary has rights and may sue. *Id.* An incidental beneficiary has no rights and may not sue to enforce them. *Id.* "Illinois courts ... 'recognize a strong presumption against conferring contractual benefits on noncontracting third parties.' " *Sosa*, 8 F.4th at 639, *quoting* 117 N.E.3d 1155, 1159 (Ill. App. Ct. 2018). See also *Coatney v. Ancestry.com DNA, LLC,* 93 F.4th 1014 (7th Cir. 2024) (describing the basis for third-

party beneficiary arguments as "shaky legal ground"). To overcome that presumption, as explained by the Seventh Circuit:

> It is not enough to show that the parties know, expect, or even intend that others will benefit from the agreement. Instead, for a nonparty to qualify as a third-party beneficiary, the language of the contract must show that the contract was made for the direct, not merely incidental, benefit of the third person. This intention must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs.

*Sosa*, 8 F.4th at 639 (quotations omitted) (citing *Marque Medicos Farnsworth, LLC*, 117 N.E.3d 1155 (Ill. App. Ct. 2018); *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 924 (Ill. App. Ct. 2009)). Further, a third-party beneficiary can only enforce an arbitration agreement when "the signatories to the agreement intended that the nonsignatories were to derive benefits from the agreement and where the arbitration clause itself is susceptible to this interpretation…" *Dannewitz v. Equicredit Corp. of Am.*, 775 N.E.2d 189, 192 (Ill. App. Ct. 2002).

Applying the principles set forth above, the Court looks to the language in the liability agreements to determine whether GeoSnap was an intended beneficiary. The Court need not spend long on its analysis. A review of the arbitration clauses in the Pre-2021 Agreements and the Gustafson 2021/2022 Agreements demonstrates that, even if GeoSnap is a Released Party, the arbitration clauses in the liability agreements do not indicate, in any way, an intent to benefit Released Parties. Pursuant to its terms, the arbitration provisions encompass "disputes, controversies, or claims arising out of my (and/or my participating minor child/ward's participation in the TM Events." (Doc. 62-1, pgs. 10, 18, 26, 40, 34-35). The arbitration clauses are silent as to nonparties, including

13

Released Parties, and there is no other language indicating that the arbitration provisions were intended to directly benefit GeoSnap or "Released Parties." Because the clauses themselves cannot be interpreted as conferring a direct benefit on GeoSnap, Released Parties,[5] or any other nonparty, GeoSnap cannot compel Plaintiffs to arbitrate. *Coatney,* 93 F.4th at 1024 (quoting *Johnson v. Noble*, 608 N.E.2d 537, 541 (Ill. App. Ct. 1992). See also *Washington v. Persona Identities,* Inc., 2024 IL App (3d) 240210, ¶ 28, appeal denied, 246 N.E.3d 1196 (Ill. 2024) ("Unless a nonparty is expressly named or its class described, a generic arbitration clause—no matter how broad—cannot show an intent to directly benefit the nonparty.").

Accordingly, GeoSnap's Motion to Compel Arbitration will be **DENIED**.[6]

## III.   DISCUSSION - MOTION TO DISMISS

### A. Legal Standard

A defendant is entitled to dismissal only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim on which relief may be granted." *Hickey v. O'Bannon,* 287 F.3d 656, 657 (7th Cir.2002) (affirming dismissal), citing *Szumny v. American General Finance, Inc.,* 246 F.3d 1065, 1067 (7th Cir.2001);

---

[5] Notably, pursuant to the liability agreements, "Released Parties" includes, among others, spectators and co-participants. Thus, to construe the arbitration clause as applicable to all "Released Parties" would lead to the untenable conclusion that even spectators or other participants could enforce the arbitration provision.
.

[6] Plaintiffs contend GeoSnap's third-party beneficiary argument "has yet another shortcoming specific to Plaintiff Sarah Gustafson." (Doc. 65, pgs. 11-12). Specifically, GeoSnap claims that, given its affiliate Partnership Agreement with Tough Mudder Incorporated, it is a "Released Party" under all of the liability agreements. The Affiliate Partnership Agreement, however, was not in effect when Gustafson executed her liability agreements with Tough Mudder. Additionally, the Gustafson 2021/2022 Agreements do not reference the entity that GeoSnap contracted with (Tough Mudder Incorporated). Instead, they refer to OCR US HOLDINGS, LLC d/b/a/ Tough Mudder…and its parent SPARTAN RACE, Inc." These facts provide an additional independent basis for finding that GeoSnap cannot compel Gustafson to arbitrate.

accord, *Chaney v. Suburban Bus Div. of Regional Transp. Auth.,* 52 F.3d 623, 626-27 (7th Cir. 1995). For purposes of deciding the motion, the court must treat the plaintiffs' allegations as true and draw all inferences in their favor, although it need not give weight to unsupported conclusions of law. *O'Bannon,* 287 F.3d at 657-58; *McLeod v. Arrow Marine Transp., Inc.,* 258 F.3d 608, 614 (7th Cir.2001); *Scott v. O'Grady,* 975 F.2d 366, 368 (7th Cir.1992).

When ruling on a 12(b)(6) motion, a court may consider documents outside of the plaintiff's complaint if they are referred to in the complaint and central to the claim. *Wright v. Associated Ins. Companies Inc.,* 29 F.3d. 1244, 1248 (7th Cir. 1994). In the instant case, GeoSnap's contract with Tough Mudder, GeoSnap's Terms & Conditions, and GeoSnap's Privacy Policy, which GeoSnap has submitted in support of hits 12(b)(6) motion, are all referenced in the Complaint, and may be considered at this stage without converting GeoSnap's motion to a motion for summary judgment. *Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687, 690 (7th Cir. 2012).[7]

### B. Section 15(b) Claims

Under BIPA, Section 15(b) imposes three specific requirements on private entities that "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information." 740 ILCS § 14/15(b). Specifically, a private entity may not collect such material unless it:

---

[7] However, as is discussed more fully herein, other extrinsic materials relied on by GeoSnap are not alleged in or integral to the complaint. As such, these materials will not be considered by the Court, and the Court declines to convert the dismissal motion to a motion for summary judgment.

(1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;

(2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

(3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

740 ILCS § 14/15(b).

Counts II-IV of the First Amended Complaint (Doc. 58) allege that GeoSnap violated § 15(b) in its entirety and that each violation of the three requirements is separately compensable. GeoSnap, citing to *Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918 (Ill. 2023), as modified on denial of reh'g (July 18, 2023), contends Plaintiffs cannot recover statutory damages for its alleged violations of subsections 15(b)(1), 15(b)(2), *and* 15(b)(3). Instead, GeoSnap argues, any violation of Section 15(b)'s requirements creates one violation – not three. Accordingly, GeoSnap claims, Counts II-IV should be dismissed and Plaintiffs should have to plead those claims as a single cause of action.

In *Cothron*, the Illinois Supreme Court addressed a related but distinct issue: whether each unauthorized scan or transmission of biometric data under Sections 15(b) and 15(d) constitutes a separate violation. The Court held that "a separate claim accrues under the Act each time a private entity scans or transmits an individual's biometric identifier or information in violation of section 15(b) or 15(d)" of the Act *Cothron*, 216 N.E.3d at 920. The Illinois Supreme Court also acknowledged that its decision opened the

16

door to "potentially excessive damage awards" under BIPA but concluded those policy-based concerns were best addressed by the legislature. *Id.* at 929.

*Cothron* focused on repeated collections of biometric data rather than the separate requirements within Section 15(b). Nonetheless, its reasoning suggests a broader principle: BIPA violations are connected to distinct acts or failures that contravene the statute's mandates. The majority emphasized the plain language of Section 15(b), which prohibits collection "unless" the entity "first" complies with the three requirements. *Id.* at 925-26. The Court relied, in part, on its prior decision in *Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019). Specifically, the Court stated: "[W]e determined in *Rosenbach* that a person is 'aggrieved' or injured under the Act 'when a private entity fails to comply with one of section 15's requirements.' " *Id.* at 927. The Court went to explain that "*Rosenbach* does not stand for the proposition that the 'injury' for a § 15 claim is predicated on, or otherwise limited to, an initial loss of control or privacy. Instead, *Rosenbach* clearly recognizes the statutory violation itself is the 'injury' for purposes of a claim under the Act." *Id.* at 928. Although the Illinois court's analysis was in the context of establishing an injury for standing (*Rosenbach*) and accrual of claims (*Cothron*), it suggests that *each* requirement carries independent weight, supporting a finding that Section 15(b)'s subparts are separately compensable.[8]

---

[8] In response to *Cothron*, the Illinois legislature amended BIPA via Senate Bill 2979. The amendment modified Section 15(b) to state that a private entity that "in more than one instance, collects, captures, purchases, receives through trade, or otherwise obtains the same biometric identifier or biometric information from the same person using the same method of collection" commits "a single violation" for which the aggrieved person is entitled to "at most, one recovery." Critically, the amendment focuses on repeated collections of the same biometric date; not on the separate requirements within Section 15(b). Thus, the amendment does not alter this Court's analysis.

17

Also relevant is the conjunctive phrasing in Section 15(b). As argued by Plaintiffs, the use of "and" between the three requirements in Section 15(b) indicates that compliance requires satisfying all three subparts, and thus a failure of any one constitutes a violation. Combining this with the rule set forth in *Rosenbach* – that BIPA is violated when an entity fails to comply with *one of* section 15's requirements – suggests that each of the three requirements in Section 15(b) is separately compensable as a distinct violation.

Finally, the Court notes that in *Halim v. Charlotte Tilbury Beauty Inc.*, No. 23 CV 94, 2023 WL 3388898 (N.D. Ill. May 11, 2023) and *Burlinski v. Top Golf USA Inc.*, No. 19-CV-06700, 2020 WL 5253150 (N.D. Ill. Sept. 3, 2020), the Northern District of Illinois allowed violations of each Section 15(b) subpart – lack of notice, disclosure as to purpose, and written consent, to be included as separate violations in the amount-in-controversy calculation when assessing CAFA jurisdiction. Although certainly not definitive, these decisions weigh against GeoSnap's position.

Ultimately, considering the plain language of Section 15(b), the Illinois Supreme Court's decisions in *Cothron* and *Rosenbach*, and the lack of binding authority rejecting Plaintiffs' distinct violations theory, along with the Northern District of Illinois treating 15(b)'s subparts as distinct for purposes of calculating the amount-in-controversy, GeoSnap cannot definitively establish that Plaintiffs' claims fail as a matter of law.[9] Therefore, the Motion to Dismiss Plaintiffs' Section 15(b) claims will be **DENIED**.

---

[9] To the extent that the Court's ruling implicates policy concerns about excessive awards, as noted in *Cothron*, that is an issue that must be addressed by the Illinois legislature.

### C. Section 15(c)

Section 15(c) of BIPA states: "No private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." GeoSnap contends Plaintiffs do not sufficiently plead a cause of action under Section 15(c) because the First Amended Complaint does not allege that GeoSnap was involved in any for-profit transactions or otherwise profited from their biometric data and, thus, has not sufficiently alleged any violation of Section 15(c) of BIPA. According to GeoSnap, the phrase "otherwise profit from" should "carry a meaning that merely reinforces the prohibition on selling access to biometric data to third-parties for profit." (Doc. 62, pg. 17).

Plaintiffs argue that, considering the following allegations, they have sufficiently pled a cause of action under Section 15(c):

- "[GeoSnap's] business model is dependent on its collection and use of the biometrics of the people depicted in the photos uploaded to its website."(Doc. 58, ¶ 5).
- GeoSnap "scans all photographs that [are] upload[ed] to its website and extracts data representing the unique geometry of each facial image in each photograph," which are biometrics. (Doc. 58, ¶¶ 30-31.
- A person who wants to find an image of themselves among the photos in GeoSnap's database can then upload a "selfie," which is likewise scanned so that facial geometry is extracted and compared against the facial biometrics already in the database. (Doc. 58, ¶ 32).
- The purpose of all this, from GeoSnap's perspective, is to "facilitate[ ] the sale of photographs through the GeoSnapShot website, and in turn generate[ ] GeoSnapShot's primary source of revenue." (Doc. 58, ¶¶ 44, 50).
- GeoSnap has represented that its partnership with Tough Mudder would help it realize "500% growth" in 2019 alone, and that its use

of facial recognition is essential to locating photos of Tough Mudder participants. (Doc. 58, ¶¶ 37, 38).

Section 15(c) broadly prohibits profiting from biometric data beyond direct sales, as evidenced by the phrase "otherwise profit from." Plaintiff alleges biometric data is a necessary element to GeoSnap's services, allowing it to generate revenue through the sale of photographs on its website, and that its transactions with Tough Mudder participants allowed GeoSnap to increase its customer base and realize 500% growth. This plausibly constitutes "otherwise profiting" under a plain reading of the statute.

GeoSnap contends that because "Plaintiffs do not allege that GeoSnap is selling access to biometrics or commercially disseminating that data to third-parties for a fee[,]" their § 15(c) claim must be dismissed. In support of its argument, GeoSnap relies, in part, on *Karling v. Samsara Inc.*, 610 F. Supp. 3d 1094 (N.D. Ill. 2022) and *Flores v. Motorola Sols., Inc.*, No. 1:20-CV-01128, 2021 WL 232627, at *3 (N.D. Ill. Jan. 8, 2021). But GeoSnap misreads these cases – they undermine, rather than bolster, GeoSnap's position. In *Karling*, the defendant used its dashcams to collect biometric data, stored that biometric data on its cloud-based dashboard, and then sold access to the dashboard to third-parties. The defendant sought dismissal of the § 15(c) claim, arguing that BIPA applies to the sale of biometric data, not to the sale of biometric technology. The Court rejected this argument, finding that, by using biometric data to enhance its revenue generating database, the defendant otherwise profited from that biometric data. Similarly,

20

*Flores* upheld a Section 15(c) claim where biometric data was a "necessary element" of the defendant's profitable business model, despite the fact that defendant was not directly selling biometric data to third parties. *Flores*, 2021 WL 232627, at *3. In the instant case, GeoSnap does not sell access to the biometric database itself. Instead, it profits from the sale of photographs, but the collection and storage of biometric data is a necessary component of its business model. Thus, like the defendants in *Flores* and *Karling*, even though GeoSnap is not directly selling biometric data to a third party, it is profiting from the collection and/or storage of biometric data.

GeoSnap also relies on *Vance v. Microsoft Corp.*, 534 F. Supp. 3d 1301 (W.D. Wash. 2021), a non-binding Western District of Washington decision. In *Vance*, the court found the plaintiffs did not allege that Microsoft directly sold biometric data, nor did they allege that the biometric data is itself was so incorporated into Microsoft's product that by marketing the product, it was commercially disseminating the biometric data. 534 F. Supp. 3d 1301, 1309 (W.D. Wash. 2021). Thus, the court dismissed the plaintiffs' section 15(c) claim. *Id.* Here, unlike the allegations at issue in *Vance*, Plaintiffs have alleged that the collection and storage of biometric data itself is incorporated in and a necessary component of GeoSnap's revenue generating business model.

GeoSnap also contends dismissal is warranted because Plaintiffs do not allege using the Website's optional selfie feature. This argument misses the mark. Section 15(c) liability hinges on Defendant's conduct – profiting from biometric

data in its possession. See *Thornley v. Clearview AI, Inc.,* 984 F.3d 1241, 1247 (7th Cir. 2021) (focusing on entity's conduct). As Plaintiffs note, the selfie feature is available only because GeoSnap has a database of potential matches created by extracting biometrics from all photos uploaded to its platform. In other words, biometrics are inextricably intertwined with GeoSnap's revenue generating business model and that is sufficient to state a claim under § 15(c).

### D.  GeoSnap's Terms & Conditions and Privacy Policy

GeoSnap contends that Adam Moomaw created an account on May 22, 2019 following his participation in a Tough Mudder event in Missouri. (Doc. 62, pg. 18; Doc. 62-2, pgs. 3, 18-19), and that Sarah Gustafson created an account on August 30, 2019, following her participation in the Tough Mudder Chicago event in Rockford, Illinois. (Doc. 62-2, pgs. 3, 22-23). In support of this claim, GeoSnap has provided the Court with a declaration from GeoSnap's founder and CEO, as well as screenshots that purportedly demonstrate Adam Moomaw and Sarah Gustafson created accounts on the Website in 2019. (Doc. 62-2).

GeoSnap further contends that, to create an account on GeoSnap's Website, a user must first check a box labeled "I Agree," indicating that the user agrees to GeoSnap's Terms & Conditions ("Terms") and Privacy Policy ("Policy").[10] (Doc. 62-2). The "I Agree" box is to the left of hyperlinks titled "Terms and Conditions"

---

[10] GeoSnap attaches copies of the Terms and Policy to the declaration provided by GeoSnap's founder and CEO. According to the declarant, these are copies of the Terms and Policy as they existed in 2019. The Court notes, however, that the attached Policy includes an effective date of March 5, 2021. (Doc. 62-4, pg. 2). Thus, it appears that the Policy provided by GeoSnap was *not* in effect when Adam Moomaw and Sarah Gustafson purportedly created their accounts.

and "Privacy Policy." As evidence of this, GeoSnap cites to the declaration from its founder and CEO, describing how users create an account (Doc. 62-2),[11] as well as the following screenshot, purportedly depicting the screen a user sees when creating an account (Doc. 62-2, pg. 16):[12]



(Doc. 62-2, pg. 16).

---

[11] The declaration describes how "users" create an account on the Website, but it does not specify whether the process being described was in effect in 2019.

[12] GeoSnap does not state whether this screenshot was taken from the Website as it currently exists or if this screenshot depicts the account creation page as it existed in 2019.

Citing to this extrinsic evidence, GeoSnap argues that, to register for an account, a user must check the "I Agree" box acknowledging acceptance of the Terms and Policy. GeoSnap further maintains that, because Adam Moomaw and Sarah Gustafson created accounts in 2019, they must have assented to the Terms and Policy. The Terms is a 12-page document that includes a release clause on page 11. Accordingly, GeoSnap argues, Adam Moomaw and Sarah Gustafson[13] released all liability for any claim whatsoever against GeoSnap related to the use of the Website. (Doc. 62, pgs. 17-18). GeoSnap further contends that the Policy was BIPA compliant and, as a result, Adam Moomaw and Sarah Gustafson's § 15(a) and 15(b) claims fail as a matter of law. (Doc. 62, pg. 20).[14]

Plaintiffs contend GeoSnap has not established that either plaintiff had notice of or assented to the Terms or Policy when they allegedly created accounts. (Doc. 65, pgs. 18-19). Additionally, Plaintiffs argue that, even assuming notice and consent, dismissal is improper because: (1) the claims do not fall within the plain language of the release; (2) the release cannot be construed to include claims not within the contemplation of the parties; (3) the record does not reflect that the purported BIPA compliant terms contained in the policy were in effect in 2019, when Adam Moomaw and Sarah Gustafson purportedly created their accounts;

---

[13] Sarah Gustafson created her account prior to her participation in the Tough Mudder events in 2021 and 2022. Accordingly, as to Gustafson, the release clause, if binding, would only foreclose her post-2019 BIPA claims.

[14] As previously noted, GeoSnap has not produced a Policy that was in effect when Adam Moomaw and Sarah Gustafson allegedly created their accounts.

and (4) the purported BIPA compliant terms contained in the Policy are illusory.

(Doc. 65, pgs. 19-22).

Although contracts formed by creating an account on a website are a "newer form[ ] of contracting," the same common law contract principles apply:

> In Illinois, as in many states, the law governing the formation of contracts on the Internet is still in the early stages of development. But there is no reason to think that Illinois's general contract principles do not apply. Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question.

*Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016).

"Generally, a party who signs a written contract is presumed to have notice of all the contract's terms." *Id.* But, because many internet users fail to realize they are agreeing to a contract, applying this principle in the context of internet transactions can be challenging. *Id.* In determining whether an agreement has been formed over the Internet, the Seventh Circuit has explained that "we might ask whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the [consumer] receives reasonable notice of those terms." *Id.* As the Appellate Court further explained, this analysis involves "a fact-intensive inquiry: we cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." *Id.* at 1034–35.

That being said, courts often find that an online contract has been formed when a customer clicks on an "I Accept" button as part of a "clickwrap" agreement. *Domer v. Menard, Inc.*, 116 F.4th 686, 694 (7th Cir. 2024) ("Courts around the country have recognized that this type of electronic 'click' can suffice to signify the acceptance of a contract.") citing *Sgouros*, 817 F.3d at 1033. "There is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." *Sgouros*, 817 F.3d at 1033-34.

GeoSnap contends the Website gave Adam Moomaw and Sarah Gustafson reasonable notice that by clicking the "I Agree" box, they were agreeing to the Terms, including the release clause found on page 11, and the Policy that GeoSnap alleges complies with BIPA. The problem for GeoSnap is that, on a motion to dismiss, the Court can only consider extrinsic materials if they are referenced in or central to the First Amended Complaint. See *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). In the instant case, this includes GeoSnap's contract with Tough Mudder, GeoSnap's Terms of Service, and GeoSnap's Privacy Policy, all of which are referenced in the Amended Complaint. This, however, does *not* include the declaration provided by GeoSnap's founder and CEO, the screenshots purportedly showing that Adam Moomaw and Sarah Gustafson created accounts, or the screenshot that purports to depict the Website's account creation page. See e.g., *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2nd Cir. 2016) (in deciding motion to dismiss, it was error for the district court to rely on extrinsic materials

26

indicating that the plaintiff's "purchases were made using an account created in 2009 and that to have registered for an account in 2008 one must have checked a box on the Registration Page, acknowledging acceptance of the 2008 Conditions of Use…[because] those facts were neither alleged in nor integral to the complaint.").

GeoSnap relies on these extrinsic materials to show that Adam Moomaw and Sarah Gustfason created accounts in 2019, and that to have created an account in 2019, they must have checked the "I Agree" box, which was positioned next to hyperlinks labeled "Terms of Service" and "Privacy Policy." GeoSnap invites the Court to consider this material and find that Adam Moomaw and Sarah Gustfason personally created accounts in 2019 and personally assented to the Terms and Policy. But to do so without converting the dismissal motion to a motion for summary judgment would be error.

Recognizing this issue, in a footnote, GeoSnap contends that to the extent that these materials are deemed to be outside the Complaint, the Court should convert its motion to one for summary judgment. The Court declines to do so. First, GeoSnap has not provided the Court with sufficient evidentiary material to render a summary judgment decision. As previously noted, GeoSnap has not established that the account creation process described in the declaration or that the account creation screenshot attached to the declaration reflect the account creation process in effect in 2019 or the account creation page as it existed in 2019.[15]

---

[15] The declaration expressly states that GeoSnap is attaching "[t]rue and accurate versions of the Terms & Conditions and Privacy Policy that existed in 2019." (Doc. 62-2 ¶ 8). The declaration, however, does not provide the same

Thus, even if considered, the extrinsic materials would not conclusively resolve the factual dispute as to notice and assent.

Second, at the parties' request, merits discovery was stayed pending resolution of the instant motion. (Docs. 37 and 43). Because Plaintiffs have not had the opportunity to fully engage in discovery to provide support for their allegations, it would be premature to convert GeoSnap's dismissal motion to a motion for summary judgment. Accordingly, the Court declines to exercise its discretion to convert GeoSnap's dismissal motion to a motion for summary judgment. See *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) (where discovery was ongoing, district court's decision to treat pleading as a motion to dismiss, rather than converting it to a summary judgment motion, was within district court's discretion).

## IV.  CONCLUSION

For the reasons set forth herein, Defendant GeoSnap PTY LTD's Motion to Compel Arbitration or, Alternatively Under Federal Rule of Civil Procedure 12(b)(6) to Dismiss Plaintiffs' Amended Complaint (Doc. 62) is **DENIED**.

The Court **FURTHER ORDERS** that the previously imposed stay on discovery is lifted. By separate Order, the Court will set a new trial date and will direct the Parties to

---

assurances as to the declarant's description of the account creation process or the screenshot purportedly representing the account creation process. Additionally, as previously noted, GeoSnap claims it has attached the Privacy Policy in effect in 2019, but the attached policy's effective date is March 5, 2021. Considering these issues, whether Adam Moomaw and Sarah Gustafson consented to the Terms or Policy is more appropriately addressed with a fully developed record at the summary judgment stage.

submit a proposed Scheduling Order.

      **SO ORDERED.**

      Dated: March 20, 2024

                                       DAVID W. DUGAN
                                      United States District Judge